Filed 11/30/15  P. v. Taylor CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FORREST CHRISTOPHER TAYLOR,<br><br>    Defendant and Appellant. | D068487<br><br><br>(Super. Ct. No. FVI902692) |


APPEAL from a judgment of the Superior Court of San Bernardino County, John M. Tomberlin, Judge.  Judgment affirmed as modified.


Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Forrest Christopher Taylor appeals from a judgment entered upon his convictions for murdering Shameka Reliford and Ealy Davis and street terrorism. The jury also found true a number of special circumstance allegations connected to the murder charges. After the court found true certain prior conviction allegations it sentenced Taylor to life without the possibility of parole for the special circumstance murder convictions and 11 years for the street terrorism conviction. Taylor appeals, contending the trial court erred in: (1) admitting a joint interview police conducted with two other suspects; (2) admitting a gang card; and (3) denying his mistrial motions. He contends these errors cumulatively prejudiced him. He also asserts the evidence did not support the conclusion that the murders were committed with the express purpose of promoting or furthering a gang interest. We conclude the trial court erroneously admitted the gang card, but conclude the error was not prejudicial. We reject Taylor's other contentions.

Taylor also claims the punishment for his street terrorism conviction should be stayed under Penal Code section 654. (Undesignated statutory references are to the Penal Code.) The Attorney General concedes, and we agree, Taylor's sentence for street terrorism should have been stayed under section 654 because the murders formed the underlying basis for the street terrorism conviction. (*People v. Mesa* (2012) 54 Cal.4th 191, 196-198.)

Finally, Taylor argues his parole revocation fine should be stricken because he was sentenced to life in prison without the possibility of parole. The Attorney General concedes the error, but contends it is not prejudicial because Taylor will never have to

2

pay the fine.  Because the abstract of judgment must be corrected to stay Taylor's street terrorism conviction, we also order the parole revocation fine to be stricken.

FACTUAL AND PROCEDURAL BACKGROUND

Davis sold cocaine and dated Reliford.  Sandra Smith, Reliford's sister, knew Taylor.  One day, Smith, Reliford and Taylor were hanging out when Taylor announced that he wanted to rob someone because he needed money.  Smith saw that Taylor had a gun in his jacket.  Smith suggested robbing Davis because he dealt drugs and always had money.  A few days later, Taylor was at Smith's home with fellow Nutty Blocc Crip (NBC) gang members William Jacobs and James Ellis.  Taylor stated he and his "boys" might rob Davis.  Smith gave Davis's telephone number to Taylor.  The men later left the apartment.

Ellis suggested pistol whipping Davis and then taking his drugs and money.  Taylor recalled that Ellis had a 9mm semi-automatic gun on him while at the apartment.  The plan was for Taylor to set up a meeting with Davis and for Ellis to steal Davis's drugs.

Taylor called Davis, telling Davis his name was "Dre-loc" and that he wanted to purchase some drugs.  Taylor directed Davis to where Ellis was waiting, while Taylor and Jacobs hid nearby.  Ellis walked up to Davis's vehicle and Taylor heard multiple gunshots.  The men then ran away.  After the shooting, Taylor took the gun to Compton for "safekeeping."  Davis and Reliford were in the vehicle and both died from gunshot wounds.

3

DISCUSSION

I. *Admission of Joint Interview*

A. Background Facts

Police separately interviewed Taylor (Chris), Ellis and Jacobs to get each suspect's version of the shooting. Police then brought the men together for a joint interview. At the start of the interview, Sergeant John Gaffney explained that each suspect's version of the events would be set forth and each suspect would later have an opportunity to agree or dispute another person's account. Gaffney first laid out Ellis's account of what happened, but mistakenly calling Ellis "Chris." One of the other officers corrected Gaffney after the first narration. Jacobs pointed out the mistake to Gaffney after the second narration, with Gaffney apologizing to Ellis and Ellis responding "No, we straight." Police then set forth Jacobs's and Taylor's version of the events. After a break, the second part of the interview began where the police asked each suspect to either agree or disagree with the various aspects of the murder.

Taylor moved to exclude the statements of Jacobs, Ellis and law enforcement during the joint interview under the hearsay rule and Evidence Code section 352, citing his rights of confrontation and to a fair trial. During trial, the court told the jury that defense counsel had objected to the interview, but the court had ruled it admissible. The court instructed the jury that the statements of police during the interview were admissible for the limited purpose of understanding the responses of the person being questioned and were not to be considered for the truth of the matter asserted or for any

4

other purpose.  The court explained it was common and permissible for officers to lie to a suspect and what the suspect responds is evidence.  The trial court later instructed the jury with CALCRIM No. 357, defining adoptive admissions.

B. Analysis

Taylor contends the trial court abused its discretion in admitting the first part of the joint interview because he never adopted Ellis's statements, including Ellis's statement that Ellis obtained a gun before Davis arrived, was told to shoot Davis and this was not the only gun the perpetrators had.  He claims these statements made it appear as if he joined in a plan to shoot and kill Davis.  Taylor asserts that because Ellis did not testify at trial, admission of Ellis's statements violated *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and his Sixth and Fourteenth Amendment right of confrontation.  We disagree.

Hearsay is inadmissible unless it falls within an exception to the hearsay rule. (Evid. Code, § 1200, subds. (a), (b).)  Testimonial hearsay, including statements made under police interrogation, is inadmissible absent witness unavailability and a prior opportunity for cross-examination.  (*Crawford*, *supra*, 541 U.S. at p. 68.)  Nonetheless, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."  (*Id.* at pp. 59-60, fn. 9.)

Additionally, a defendant's own admissions are an exception to the hearsay rule. (Evid. Code, § 1220.)  Similarly, a hearsay exception for adoptive admissions permits introduction of an out-of-court statement against a party if "the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."  (Evid. Code, § 1221.)

5

There are two requirements to satisfy the hearsay exception for adoptive admissions: the party must (1) have had knowledge of the content of the declarant's statement, and (2) with such knowledge, have used words or conduct indicating his or her adoption of, or his or her belief in, the truth of such hearsay statement. (*People v. Combs* (2004) 34 Cal.4th 821, 842-843; see Evid. Code, § 1221.) The trial court may admit the proffered evidence of an adoptive admission if the evidence supports a reasonable inference that these preliminary facts exist and then the jury must determine whether an adoptive admission was actually made. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011.) When admissibility for such evidence is established, admission into evidence of the statements of the third person does not violate the defendant's Sixth Amendment right to confront and cross-examine accusers as construed by *Crawford*. (See *People v. Combs*, at pp. 842-844.)

During the first portion of the interview, Ellis did not describe the incident; rather, Gaffney summarized Ellis's prior statements, including Ellis's purported statements that Ellis obtained a gun before Davis arrived, was told to shoot Davis and this was not the only gun the perpetrators had. Regarding such narratives, the trial court instructed the jury that the statements of police during the interview were not to be considered for the truth of the matter asserted or for any other purpose, and were admissible for the limited purpose of understanding the responses of the person being questioned. There was no *Crawford* violation because Ellis made no statements during the first part of the interview. More importantly, Taylor never adopted Gaffney's summary of Ellis's purported statements.

Taylor next asserts that Ellis agreed with Gaffney's summation. A careful reading of the transcript does not support this conclusion. During the first narrative, Gaffney mistakenly called Ellis "Chris," but one of the other officers corrected Gaffney. During Gaffney's second narration, Gaffney yet again referred to Ellis as "Chris" and asked at the end of the summary "Chris, did, did I leave something out, or did I get something a little bit wrong?" After Jacobs corrected Gaffney, Gaffney apologized to Ellis, with Ellis responding "No, we straight." When considered in context, Ellis's "we straight" comment amounted to an acceptance of Gaffney's apology, not an acceptance of the truth of all the statements in Gaffney's two summaries.

In any event, even if Ellis's "we straight" statement could be construed as adopting Gaffney's summary, Taylor never adopted Gaffney's summary of Ellis's purported statements. Moreover, during the first portion of the interview, Taylor and Ellis both agreed that the plan was for Ellis to pistol whip Davis. Additionally, during the second part of the interview, Taylor recalled that Ellis had a gun at Smith's apartment. Thus, again assuming the jury might have considered Ellis's "we straight" comment as agreeing to Gaffney's summary, Ellis and Taylor later rebutted the most damaging part of Gaffney's summary that the plan had been to shoot Davis. Accordingly, any error in admitting this evidence was harmless beyond a reasonable doubt. (*People v. Jennings* (2010) 50 Cal.4th 616, 652 [conviction should not be set aside for confrontation clause violation if the error was harmless beyond a reasonable doubt].)

Next, Taylor contends the first portion of the interview should have been excluded in its entirety under Evidence Code section 352, because the probative value of any admissions or adoptive admissions by him was diminished by the cumulative nature of the point-by-point second portion of the interview, and the probative value was outweighed by the likelihood that the jury was misled and confused regarding whether Taylor made adoptive admissions and because Gaffney repeatedly confused Taylor's name and Ellis's name.

Evidence that is more prejudicial than probative must be excluded (Evid. Code, § 352) and trial courts have discretion to determine when that line is crossed and the evidence has become too cumulative or prejudicial (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193). For purposes of Evidence Code section 352, the term prejudice applies to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual and has very little effect on the issues. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.) A trial court's exercise of discretion under Evidence Code section 352 will not be overturned on appeal absent a manifest abuse of that discretion. (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.)

Here, the trial court acted within its discretion when admitting the first portion of the interview. As the Attorney General noted, the first portion of the interview provided the jury with some context for the second portion of the interview where the police merged the accounts of the three suspects, asking each suspect whether he agreed with a particular point. While Gaffney's repeated reference to Ellis as "Chris" was unfortunate, the likelihood of jury confusion was minimal as Gaffney admitted his errors.

8

The instructions to the jury also minimized any potential prejudice by informing the jurors that police statements were not to be considered for the truth of the matter asserted and there is no adoptive admission if, under the circumstances, the defendant could have denied the statement but did not. (CALCRIM No. 357.) Before the joint interview commenced, the police informed the suspects of the rules, including that they were not to talk if they heard something they disagreed with as everyone would have an opportunity to speak later in the interview. Given the circumstances, the jury would have known that Taylor's silence during the first part of the interview did not constitute adoptive admissions. Finally, during the second half of the interview, Taylor admitted his involvement in the plan to rob Davis, including his role as the caller who lured Davis to the park, recalled that Ellis had a gun while at Smith's apartment and stated that after the shooting he took the gun to Compton for "safekeeping." Even assuming any error in the admission of the first portion of the interview, it did not result in a miscarriage of justice.

## II. *Admission of Gang Card*

A. Background Facts

A transportation deputy came into contact with Taylor when transporting him to another location. The deputy noticed that Taylor had a tattoo on his arm that resembled the New York Yankees symbol and asked Taylor what it stood for. The deputy was concerned that Taylor might be a gang member and that Taylor had not been properly housed and classified. Taylor responded that the tattoo stood for the New York Yankees, but the deputy thought Taylor was being untruthful and the tattoo might be gang related.

9

The deputy filled out a gang identification card on Taylor to make sure Taylor was housed and transported correctly for the safety of staff and other inmates and to avoid gang conflict. The deputy could not recall whether he advised Taylor of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), but normally does not provide such an advisement.

During trial, defense counsel objected to the gang expert's reliance on information in the gang card. The court found the gang card admissible despite the lack of a *Miranda* advisement. The gang card admitted into evidence stated Taylor was a member of the NBC gang based on his self-admission that he was jumped into the gang at age nine and that he had gang tattoos such as "Compton Crip," "Nutty By Nature" and "N B CC." Taylor, however, refused to sign the card.

B. Analysis

Taylor asserts the trial court should have excluded his statements to the deputy regarding his gang affiliation and the completed gang card because he did not receive a *Miranda* warning. Relying on *People v. Gomez* (2011) 192 Cal.App.4th 609 (*Gomez*), the Attorney General claims *Miranda* does not apply because Taylor was not subject to a custodial interrogation, but even if *Miranda* applied, the error was not prejudicial

Recently, in *People v. Elizalde* (2015) 61 Cal.4th 523 (*Elizalde*), the California Supreme Court rejected the analysis in *Gomez* and held that while police may ask questions to address jail security concerns, when police know or should know that such an inquiry is reasonably likely to elicit an incriminating response from the suspect, the suspect's responses are not admissible against the suspect in a subsequent criminal

10

proceeding unless the initial inquiry has been preceded by *Miranda* admonishments. (*Elizalde*, at pp. 527, 538 & fn. 9.)  Nonetheless, "[t]he erroneous admission of a defendant's statements obtained in violation of the Fifth Amendment is reviewed for prejudice under the beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 [(*Chapman*)].  [Citations.]  That test requires the People here 'to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  (*Chapman*, at p. 24.)"  (*Elizalde*, at p. 542.)

Although the gang expert considered the gang card in determining Taylor's gang membership, Taylor's gang membership was convincingly established by other evidence, including statements Taylor made to police after receiving a *Miranda* warning that he was a member of the NBC and had been "jumped" into the gang when he was about 10 years old.  Accordingly, we conclude the error was harmless beyond a reasonable doubt.

### III. *Mistrial Motions and Alleged Prosecutorial Misconduct*

A. Background Facts

The trial court ruled the prosecutor could present evidence of Taylor's prior robbery conviction as a gang predicate, but concluded Taylor's parole status at the time of the murder was irrelevant and inadmissible.  During trial, three witnesses referred to Taylor's parole or prison record.

First, an officer who participated in arresting Taylor explained that he went to Taylor's home and told Taylor when Taylor came to the door they were there to conduct a parole compliance check.  Taylor objected to the parole reference and moved for a mistrial.  The trial court concluded the reference was innocuous and would not prejudice

11

the defense as the jury would learn of Taylor's prior robbery conviction as a gang predicate and it was not clear from the testimony that Taylor was on parole as the officer did not specify whose parole they were investigating. The jury later learned that six people lived at the home.

During the testimony of another officer who had interviewed Taylor about his gang affiliation, the officer stated that Taylor denied having spent time with NBC gang members since his release from prison. The court struck the answer, but later denied Taylor's renewed mistrial motion. Pursuant to counsel's request, the court instructed the jury:

> "In the course of this trial and the testimony of [two officers], evidence was presented relating to a parole check being conducted at Mr. Taylor's father's residence and that Mr. Taylor had previously been to prison. If you should attribute the former evidence to Mr. Taylor, in light of the latter evidence being ordered stricken by the Court, you are not permitted to consider such evidence to prove that Mr. Taylor is a person of bad character or that he has a disposition to commit the crimes charged."

Finally, Smith testified about a conversation she had with Taylor in which Taylor mentioned that he needed to see his parole agent. The court struck this testimony, but denied Taylor's renewed mistrial motion.

During closing argument, Taylor's counsel noted some ambiguity as to what Taylor knew about the gun before the murder. At one point in the joint interview, Taylor claimed to have provided the gun to Ellis; at another point, Taylor agreed with Ellis's statement that Ellis picked up the gun and no one had given Ellis the gun. Ellis later asserted he had the gun in his pocket. Defense counsel suggested that the different

12

accounts raised reasonable doubt about what Taylor knew and whether Taylor was accepting a false accusation because Ellis had more to lose because of his status as a convicted felon.  In rebuttal, the prosecutor attacked the argument that Ellis had more to lose because of his status as a felon.  The prosecutor argued that Ellis was a "big bad felon" and then pointed out that Taylor was also a felon.  The trial court overruled defense counsel's objection and later denied Taylor's mistrial motion.

B. Analysis

Taylor contends the witnesses' improper statements resulted in the jury learning that he had been sent to prison, was on parole and required to visit his parole agent.  He asserts this made him appear to be a dangerous criminal as the average juror would not understand the prevalence of parole after imprisonment and would view being a parolee as indicating serious concern about his future criminality.

We review the trial court's denial of a motion for a mistrial for an abuse of discretion.  (*People v. Avila* (2006) 38 Cal.4th 491, 573.)  A mistrial is warranted only when a defendant's chances of receiving a fair trial have been irreparably damaged, meaning prejudice that is incurable by admonition or instruction.  (*Ibid.*)  The trial court is vested with considerable discretion to assess incurable prejudice because, by its nature, that inquiry is speculative.  (*Ibid.*)  While the volunteered statement of a witness can sometimes provide the basis for a finding of incurable prejudice (*People v. Ledesma* (2006) 39 Cal.4th 641, 683), the improper subject matter will rarely be " 'of such a character that its effect . . . cannot be removed by the court's admonitions.' "  (*People v. Allen* (1978) 77 Cal.App.3d 924, 935.)

13

Here, there was no such irreparable damage to Taylor's right to a fair trial. The first mention of parole came during testimony about officers arriving at Taylor's home to do a parole compliance check. The officer did not state Taylor was the individual on parole and the jury learned that six people lived at the home. We agree with the trial court's conclusion that this nonspecific reference to parole was not prejudicial.

The second officer's reference to Taylor having been in prison and Smith's statement that Taylor needed to see his parole officer was exceedingly brief and the trial court immediately struck the answers. The court also instructed the jury not to consider stricken testimony or that any mention of prison proved Taylor was a person of bad character or disposed to commit the crimes charged. We presume the jury followed these instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331.)

Finally, Taylor asserts the prosecutor engaged in misconduct in his rebuttal argument when arguing that both Ellis and Taylor were felons as this permitted him to be convicted based on prejudicial propensity evidence.

In evaluating a claim of prosecutorial misconduct, we examine the questioned conduct in the context of the whole argument and the instructions to the jury given by the trial court (*People v. Lucas* (1995) 12 Cal.4th 415, 475) and presume that "the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." (*People v. Sanchez* (1995) 12 Cal.4th 1, 70.) To prevail on a claim of misconduct during argument, the defendant must show a reasonable likelihood the jury construed or applied the remarks in an improper manner. (*People v. Ayala* (2000) 23 Cal.4th 225, 284.)

14

The prosecutor's rebuttal argument that both Ellis and Taylor were felons simply responded to defense counsel's suggestion that Taylor may have been protecting Ellis who had more to lose because of Ellis's status as a convicted felon. The argument did not amount to misconduct as it constituted fair comment on the evidence and the reasonable inferences or deductions therefrom. (*People v. Hill* (1998) 17 Cal.4th 800, 819.) Accordingly, we conclude the trial court did not abuse its discretion in denying Taylor's requests for a mistrial.

IV. *Cumulative Error*

A series of trial errors, though harmless when considered independently, may in some circumstances rise to the level of prejudicial, reversible error. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

Here, Taylor asserts the cumulative effect of the above three errors resulted in a denial of his Fourteenth Amendment right to a fair trial and were not harmless beyond a reasonable doubt. As we discussed, admission of the gang card and references to parole or prison were harmless individually. (*Ante*, pts. II & III.) For the same reasons we concluded there is no reasonable possibility either of the above claimed errors separately affected the jury's verdict, we also conclude there is no reasonable possibility they collectively affected the jury's verdict. Consequently, we conclude the accumulation of the claimed errors did not deprive Taylor of due process and a fair trial.

15

V. *Gang Enhancements*

Taylor contends the vague and generic testimony by the gang expert did not support the gang special circumstance allegation under section 190.2, subdivision (a)(22) as it failed to show the murders were carried out to further the activities of the NBC gang, or the gang enhancement allegation under section 186.22, subdivision (b) as it failed to show the murders were gang related. He points out that the shooting had none of the earmarks of a gang incident as there was no evidence that the shooting was in gang territory, any gang declarations were made or that Davis was a rival gang member. We disagree.

A. General Legal Principles

We review the sufficiency of the evidence to support gang enhancement allegations under the same standard we apply to a conviction. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) Namely, we examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which the jury could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576, 578.) We must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the verdict," we will not reverse. (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429.) A jury may rely on expert testimony about gang culture and habits to reach a true finding on a gang-enhancement allegation (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930), and may reasonably rely on the

16

testimony of a single witness, unless the testimony is physically impossible or patently false. (Evid. Code, § 411; *People v. Cudjo* (1993) 6 Cal.4th 585, 608.)

A trier of fact may rely on inferences to support a conviction if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true. (*People v. Raley* (1992) 2 Cal.4th 870, 890-891.) A reasonable inference, however, must be an inference drawn from evidence, it may not be based on suspicion alone or speculation. (*People v. Davis* (2013) 57 Cal.4th 353, 360.) We do not reweigh evidence or determine if other inferences more favorable to the defendant could have been drawn from it. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

B. Gang Enhancement

Section 186.22, subdivision (b)(1) prescribes a sentencing enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." A gang enhancement under this statute contains two distinct prongs. (*People v. Albillar* (2010) 51 Cal.4th 47, 59 (*Albillar*).) The first prong requires a finding that the crime was "gang related" in the sense of being for the benefit of, at the direction of, or in association with a gang. (*Id.* at p. 60.)

The second "specific intent" prong of the enhancement requires "only the specific intent to promote, further, or assist criminal conduct by *gang members*" (*Albillar*, *supra*, 51 Cal.4th at p. 67), and "applies to any criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction

17

sought to be enhanced." (*Id.* at p. 66.) This prong may be satisfied by substantial evidence the defendant committed the felony with known members of a gang, from which the trier of fact may fairly infer this specific intent. (*Id.* at pp. 67-68.)

Taylor does not address the specific intent prong. Possibly because the police interview amply shows he conspired with other gang members to rob Davis and participated in the murder by calling Davis and directing him to Ellis's location. Taylor's "intentional acts, when combined with his knowledge that those acts would assist crimes by [a] fellow gang member[ ], afford[s] sufficient evidence of the requisite specific intent." (*People v. Morales* (2003) 112 Cal.App.4th 1178, 1198-1199 (*Morales*).)

The evidence also supports a finding that Taylor committed the murder in association with a gang. Evidence that gang members acted in concert can provide substantial evidence the crime was committed in association with the gang. (*Albillar*, *supra*, 51 Cal.4th at pp. 60-63.) The evidence at trial disclosed that Taylor, Ellis and Jacobs were members of the NBC gang. Crimes committed by the NBC gang include murder to petty theft and everything in between, including selling narcotics such as cocaine and crack. A gang expert testified that a person can gain respect within a gang by committing crimes or by bringing in product such as narcotics or stolen cars.

Taylor asserts the shooting had none of the earmarks of a gang-related incident and appeared to have been personally motivated by the desire for drugs. Such arguments, however, are for the jury. He also claims the vague and generic gang expert testimony failed to show the incident was gang related. "The credibility and weight of the expert testimony was for the jury to determine, and it is not up to us to reevaluate it." (*People v.*

18

*Flores* (2006) 144 Cal.App.4th 625, 633.) Under the appropriate standard, we have reviewed of all the evidence, direct and circumstantial, and we have presumed the existence of every fact the jury could reasonably have inferred from the evidence, without reweighing the evidence or resolving conflicts. (See, e.g., *People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.) Where, as here, the evidence is sufficient to establish the crime was committed "in association" with a gang, the prosecution need not prove that it was committed for the benefit of or at the direction of a gang. (*Morales*, *supra*, 112 Cal.App.4th at p. 1198.) In sum, we conclude substantial evidence supported the jury's true finding on both portions of the gang enhancement under section 186.22, subdivision (b)(1).

C. Gang Special Circumstance

Section 190.2, subdivision (a)(22) provides for a special circumstance of life without the possibility of parole where a defendant commits a first degree murder in a case in which "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." As another court noted, the language in section 190.2, subdivision (a)(22), which requires proof that the murder furthered the activities of the criminal street gang, "substantially parallels the language of section 186.22, subdivision (b)(1), which authorizes a sentencing enhancement for felonies 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'" (*People v.*

*Carr* (2010) 190 Cal.App.4th 475, 488.) The gang special circumstance applies to perpetrators as well as aiders and abettors. (*People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1086.)

The only element of the special circumstance challenged by Taylor is whether the murder "further[ed] the activities" of the NBC gang. "In common usage, . . . 'further' means to help the progress of . . . ." (*People v. Ngoun* (2001) 88 Cal.App.4th 432, 436.) A primary purpose of the NBC gang was to commit crimes, including murder and selling narcotics. The gang expert knew of no noncriminal purpose for the gang. Stealing narcotics amounts to a financial gain for the gang as it gets drugs for free and then sells them for a profit.

The gang expert also testified that generally a gang member can increase his status by committing more crimes and opined that Ellis's act of shooting the victim in front of other gang members would greatly elevate Ellis's status. Additionally, a gang member with more status than other members could direct other gang members to do certain acts to determine their loyalty to the gang and benefit the gang by completing the act. From this evidence the jury could reasonably infer Taylor called Davis and directed him to Ellis's location with the intent to further the activities of the NBC gang and increase his and Ellis's status within the gang.

DISPOSITION

The judgment is modified to stay the sentence on count 3 for street terrorism under section 654 and to strike the parole revocation fine. As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and forward it to the Department of Corrections and Rehabilitation.

McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

AARON, J.

21